**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TERRI L. ROMÁN**, | |
| Plaintiff, | |
| v. | Case No. 12-cv-01321 (CRC) |
| **JULIAN CASTRO, Secretary of Housing and Urban Development**, | |
| Defendant. | |

### MEMORANDUM OPINION

Cupcakes embedded with nails served at an office potluck.  A fake transfer order dangled as bait to catch a suspected computer hacker.  A formal investigation launched after an employee posted her probation notice in the office restrooms.  Sexual harassment allegations levelled against a sight-impaired supervisor's female reader.  Plotlines from a low-budget telenovela?  Sadly not.  All in a day's work, it would seem, in the Office of the General Counsel of the United States Department of Housing and Urban Development ("HUD").

Center stage in the melodrama is Plaintiff Terri Román, a veteran HUD lawyer.  After complaining of mistreatment at the hands of a supervisor, Román claims she suffered a series of discriminatory and retaliatory reprisals ranging from being subjected to bogus internal investigations to being denied a promotion and suspended for two days.  She seeks redress through a suit under Title VII of the Civil Rights Act of 1964.  HUD casts Román as the disgruntled obstructionist, hurling wanton allegations of discrimination against colleagues and superiors in order to thwart the agency's legitimate efforts to confront her substandard performance.  HUD thus moves for summary judgment on all counts of Román's Complaint.  Although Román has failed to link HUD's alleged transgressions to her gender, the Court will

not bring the curtain down on her suit entirely.  As explained below, it will grant summary

judgment for HUD on Román's discrimination claims and two of her retaliation claims, but

permit Román to present her other claims of retaliation to a jury.

## I.     Background

Terri Román is a GS-14 level Trial Attorney in the Office of Litigation of HUD's Office

of General Counsel.  She began working at HUD in 1987 and joined the Office of Litigation in

1999 after completing law school.  In April 2006, Román was detailed to the temporary position

of Acting Managing Attorney, a GS-15 position, in the Office of Litigation.  Román claims that

until 2007, she had received 20 consecutive "Outstanding" ratings in her annual performance

evaluations, including for the period during which she served as Acting Managing Attorney.

Compl. ¶ 12.  Her positive reviews notwithstanding, HUD asserts that "[t]he record clearly

demonstrates that [Román's] work as an attorney . . . , particularly her legal writing, was below

an acceptable level for the agency."  Def.'s Mot. Summ. J. 4.

### A.     April 2007 Meeting and Immediate Aftermath

On April 17, 2007, Román and three of her colleagues met with HUD's then General

Counsel, Robert Couch, and then Deputy General Counsel, Michael Flynn, to voice objections to

allegedly unlawful employment practices by Román's second-line supervisor, Nancy

Christopher.  Couch invited Christopher to join the meeting while it was in progress.  With

Christopher present, Román and her colleagues complained about Christopher's alleged

preferential treatment of young, male attorneys; her impending suspension of a senior female

attorney in the Office of Litigation; and her requests of Román to "perform traditional female

tasks," such as "beautify[ing] the office with plants," cooking for private parties thrown by

Christopher, and organizing an office celebration for Christopher's elevation to the Senior Executive Service.  Compl. ¶ 20.

Román alleges that her relationships with her supervisors deteriorated further after the meeting with the General Counsel.  Just three days after the meeting, Gerald Alexander, Assistant General Counsel of the Office of Litigation and Román's first-line supervisor, began creating a Memorandum for Record ("MFR") documenting email exchanges with or concerning Román and notes criticizing her performance.  See Pl.'s Opp'n 11; id. Ex. 18.  Román also maintains that her supervisors began to reassign her cases to junior, male attorneys until, within a year of the meeting, all of her major cases had been given to others.  See Compl. ¶¶ 23, 26.

        B.    <u>Nonselection</u>

On April 19, 2007, HUD listed a vacancy for the permanent position of Managing Attorney, in which Román had been serving on an interim basis.  Román applied but was not selected for the position.  On May 30, 2007, Christopher and Alexander instead chose Allen Villafuerte, a male attorney who Román claims was no more qualified than she was.  See Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") 3.  No notes from the interviews were produced during discovery.  The only documentation of the interview process in the record is a composite scoresheet showing that Villafuerte was rated ahead of Román by a score of eleven to ten.  See id. at 44.  Román maintains that the "scoring process was entirely subjective" and did not accurately reflect the interview panelists' impressions of the applicants.  Id. at 12.  According to Román, Villafuerte scored higher only because he had not complained about Christopher's employment practices, as she had.  See id.

C.      EEO Counseling and Aftermath

Román sought Equal Employment Opportunity ("EEO") counseling in August 2007, identifying Christopher, Alexander, and General Counsel Couch as having discriminated and retaliated against her.  Approximately two months later, on October 12, 2007, Alexander contacted Nancy Hogan, a HUD Human Resources Specialist, to ask about the possibility of taking disciplinary action against Román for what he viewed as a series of misrepresentations on her part.  The following month, Christopher and Alexander downgraded Román to a "Fully Successful" performance rating for 2007, from the "Outstanding" ratings she had previously received.  Alexander followed up with Hogan the next day to discuss a proposal to suspend Román from service for exhibiting a "lack of candor."  See Pl.'s Opp'n Ex. 6, at US00006347. Hogan recommended that Alexander reduce the proposal to a letter of reprimand because Román had been a federal employee for twenty years with no prior disciplinary record.  Despite this recommendation, Alexander ultimately decided to issue a Proposal to Suspend, discussed further below.

D.      EEO Complaint and Cupcake Incident

Meanwhile, within two weeks of her "Fully Successful" performance rating in November 2007, Román filed a formal EEO complaint alleging discrimination and retaliation by Christopher and Alexander.  Less than two months following that complaint, on January 7, 2008, HUD's Office of Protective Services initiated an investigation of Román based on Christopher's suspicion that Román had brought treats with nails baked into them to the Office of Litigation's potluck holiday party.  According to HUD, Mr. Villafuerte "discovered the nail when he attempted to eat [a] cupcake."  Def.'s Statement Material Facts ¶ 15.  Román insists that she was on extended leave and not present in the building during the holiday party.  While HUD

4

acknowledges that Román was on leave at the time, it explains that she was investigated because "she was one of two disgruntled employees identified to investigators by Ms. Christopher." Id. The investigation was closed without determining who was responsible. According to Román, however, it was "clear from the record that it could not possibly have been [her]." Pl.'s Opp'n 15.

### E.    Performance Improvement Plan

Later that month, on January 28, 2008, HUD placed Román under a form of probation, termed a Performance Improvement Plan ("PIP"), to address Román's "less than fully successful" written work. Compl. ¶ 34. HUD also revoked Román's teleworking privilege. The PIP required Román to improve her writing, with Alexander's assistance. Román maintains that the quality of her work remained strong throughout her employment with HUD and that no assistance or feedback was ever provided. While the plan was in place, Christopher denied Román's request to take four hours of annual leave even though Román claims she had more than enough leave to fulfill the request. See id. ¶ 40.

### F.    Proposal to Suspend

A few weeks later, on February 22, 2008, Alexander issued the above-noted Proposal to Suspend without pay for five days for exhibiting a "lack of candor" on three separate occasions. The first incident involved Román's handling of a briefing schedule in one of her cases. According to Alexander, he had asked Román to confer with opposing counsel in a bankruptcy matter to expedite briefing by seven days. See Pl.'s Opp'n Ex. 9, at 1. After conferring, Román told Alexander that opposing counsel did not consent to modifying the briefing schedule. Alexander learned a few days later, however, that opposing counsel had *not* opposed the modification, but had rather said he would agree so long as the bankruptcy trustee had no

objection.  Alexander then spoke to the trustee, who said Román had never contacted him to discuss the modification.  See id. at 1–2.  Román insists that she attempted to contact the bankruptcy trustee and that—because opposing counsel's consent was predicated on the trustee's consent—when she was unable to reach the trustee, she informed Alexander that opposing counsel did not consent to the change.

The second incident mentioned in the proposal focused on Román's possession of an electronic copy of a memorandum from Christopher detailing staff awards to be given out at the end of the year, which had not yet been distributed to the staff.  The proposal noted that after "thorough factfinding," Alexander "concluded that [Román] was not candid in [her] description of the circumstances under which [she] obtained the awards memo," id. at 2, or as to whether she had shared the memo with other employees, id. at 3.  Román had said that the document was emailed to her by a fellow employee, but, according to the proposal, that employee "explicitly denied having emailed the memo to [Román]."  Id.  And, though Román denied having shared the memo's contents with anyone other than a single colleague, another colleague referred to the memo's contents in EEO claims that she separately asserted against the agency, contending that the memo showed that Christopher and Alexander were rewarding staff members who supported their discriminatory treatment of female employees.  See id.

Third, the proposal charged Román with a lack of candor in explaining why she failed to retain documents pertaining to a department audit she had overseen as Acting Managing Attorney.  After Villafuerte became the permanent Managing Attorney, he asked Román for the documents in question.  She responded that she had deleted the files when she was not selected for the Managing Attorney position and it became clear that she would not be involved in future audits.  She added that it was her regular practice to delete electronic files when she knew she

would no longer have use for them.  Following a review of her electronic files, Alexander

determined that Román had not been candid because she had in fact retained "a plethora of

personal and [other] HUD documents that could not possibly be of use to [her] in the future."  Id.

at 4.

The Proposal to Suspend, along with a reply by Román, was reviewed by Deputy General

Counsel John Herold, who had been designated the deciding official.  While the proposal was

under review, Román's PIP expired on May 2, 2008, and Alexander issued her an Opportunity to

Improve ("OIP") notice, citing her performance as having fallen to the level of "unacceptable."

Pl.'s Opp'n 22.  Under the OIP, Román was given 60 days to improve her performance, or else

risk removal or a reduction in grade.

> G.    Reassignment

Five days after Román was placed under the OIP, on May 7, 2008, she filed a complaint

against Alexander with HUD's Protective Services Division on the ground that "she was

concerned about her safety when alone" with him.  Def.'s Statement Material Facts Ex. 2 pt. B,

at US00004150; see also id. at US00004149–52.  She claimed that Alexander had "paced back

and forth" in her presence, adopting an "aggressive posture" and making "hostile" comments

toward her.  Id. at US00004150.  The Division closed the investigation after speaking with

Alexander, concluding that he did not pose a safety concern.  See id. at US00004150–52.

Later that month, on May 25, 2008, Román was reassigned to report to Doris Finnerman

rather than to Alexander.  According to Román, Finnerman had recently been selected for the

position of Assistant General Counsel of the Office of Litigation over Román, and the selection

had been the subject of one of Román's amended EEO complaints.  See Pl.'s Opp'n 23. Román

claims that she was reassigned so that Alexander could avoid the appearance of retaliation when

she was ultimately removed from service.  See id.  Agency HR specialists who were deposed

testified that reassigning an employee while she is under a PIP or OIP is improper and that the

transfer should have triggered a cancelation of Román's PIP/OIP status.  See Pl.'s Opp'n Ex. 44,

at 50 (HR specialist James Keys's testimony that "[y]ou can't reassign an employee while

they're on a PIP/OIP because it will cancel out the entire process"); see also id. Ex. 43, at 46–49

(HR specialist, and Mr. Keys's superior, Sinthea Kelly, testifying to the same).  HUD counters

that Román's "complaint to Protective Services about Mr. Alexander just two weeks earlier

necessitated the change."  Def.'s Statement Material Facts ¶ 20.

### H.    Sexual Harassment Charge and Birmingham Transfer Order

Less than two weeks later, on June 4, 2008, Román reported that she had been sexually

harassed by Christopher's assistant, Renita Gleaton.  Compl. ¶ 48.  Gleaton provides reading

services for Christopher due to her impaired eyesight.  See Def.'s Statement Material Facts ¶ 22.

Investigators were unable to substantiate the accusations.  See id.  Later that month, Christopher

and Gleaton created a false email purporting to involuntarily reassign Román from HUD

headquarters in Washington, D.C. to an outpost in Birmingham, Alabama.  See Pl.'s Opp'n 28;

id. Ex. 38 (Christopher Dep.), at 105–14.  Christopher acknowledged in her deposition that they

did so in an effort to confirm their suspicion that Román had been secretly accessing

Christopher's computer.  See id. Ex. 38, at 114. But instead of retaining the document in only

electronic form, Román claims that Gleaton sent it to a networked printer in the office, where

Román discovered it.  See Pl.'s Opp'n 28.  Despite Román's apparent discovery of the document

in hard-copy form, Christopher reported to the HUD Office of Inspector General ("OIG") that

she suspected Román had accessed her computer without permission.  While the subsequent

investigation did not rule out the possibility that Christopher's computer could have been

accessed by others, see id. Ex. 38, at 114–15, OIG found no evidence of unauthorized computer access by Román.

      I.     <u>Suspension</u>

Two months later, on August 19, 2008, the deciding official, Herold, issued his decision on Alexander's Proposal to Suspend Román.  He sustained the charge of lack of candor, explaining that Román had "undermine[d] the proper functioning of the Office of General Counsel" by giving "inaccurate information to a supervisor" regarding the request for an expedited briefing schedule.  Pl.'s Opp'n Ex. 13, at 3.  The decision did not address the other two bases for the lack-of-candor charge.  Herold downgraded the proposed suspension period from five days to two, however, on the ground that lack of candor is a lesser offense than that of deliberate misrepresentation, but he admonished that Román "should not misinterpret the seriousness of the matter, including the harm caused to the agency's interest and to the attorney-client relationships."  <u>Id.</u>  Román served her suspension without pay from August 20, 2008 through August 21, 2008.  <u>See</u> <u>id.</u>

      J.     <u>Proposal to Remove</u>

In October 2008—two months after her suspension—Román discovered a copy of a proposal to remove her, authored by Finnerman, for failure to produce "reliable written work."  Pl.'s Opp'n Ex. 10.  She again contends it was left on a networked printer.  Not pleased, Román responded by taping copies of the proposal in both the women's and men's restrooms on the tenth floor of HUD's headquarters.  Upon learning that Román had discovered the proposal and suspecting that she had purloined it from Finnerman's computer, Christopher again referred Román to OIG.  This time, a review of HUD's server logs in the course of the ensuing investigation corroborated Román's account that she found the proposal on a printer.  <u>See</u> Def.'s

Statement Material Facts ¶ 26; Pl.'s Opp'n 29; id. Ex. 28, at US00003440.  On October 21, 2008, Finnerman issued the Proposal to Remove.  Pl.'s Opp'n Ex. 10.  Later that week, Román was given a "Fully Successful" performance rating for 2008 overall, but was rated "Minimally Satisfactory" for "Reliable Written Work."  Def.'s Statement Material Facts ¶ 27.  Román then requested a transfer to a vacant position in HUD's Office of Insured Housing, which Christopher denied.  Pl.'s Opp'n Ex. 45 ¶ 35.

K. Denial of Proposal to Remove and Detail to U.S. Attorney's Office

Herold, who was also designated as the deciding official for Finnerman's Proposal to Remove Román, denied the Proposal in January 2009.  The Proposal noted that under the OIP, Román had been required to produce written work product meeting certain quality standards "with no more than seven (7) exceptions cumulatively."  Pl.'s Opp'n Ex. 14, at 1.  While the Proposal listed eight examples of deficient work, Herold found that one of the eight was a research, rather than a writing, assignment and therefore did not constitute "written work product."  Id. at 2.  Because *more* than seven deficient pieces of written work product were required for removal, he denied the request without considering the remaining seven exceptions listed in the Proposal.  See id. at 1–2.

From February through December 2009, Román was detailed to the Civil Division of the U.S. Attorney's Office for the District of Columbia.  At the end of the detail, the Division offered to extend it by six months.  According to Román, HUD refused the offer and required her to return to the agency "in a new position in a remote building cut off from the rest of" the Office of General Counsel.  Pl.'s Opp'n 27.  The new position, which Román still holds, is in the Department's Program Enforcement Division.  Her new supervisor, Deputy Assistant General

Counsel Joel Foreman, placed Román under a PIP for "minimally successful" written work after her return.  See Def.'s Statement Material Facts ¶ 34.

## II.      Procedural Background

In May 2012, HUD's Equal Employment Opportunity Division issued its Final Agency Decision on Román's formal EEO complaint, denying all of her claims of discrimination.  See Def.'s Statement Material Facts ¶ 6.  Román timely filed this action on August 9, 2012.  Her Complaint alleges eight counts of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16: Retaliatory Hostile Work Environment (Count I); Discriminatory Hostile Work Environment (Count II); Retaliatory Suspension and Nonselection (Counts III and VI); and Discriminatory Suspension and Nonselection (Counts IV, V, VII, and VIII[1]).  After lengthy discovery, HUD moved for summary judgment on June 2, 2015, and the Court held a hearing on the motion on November 20, 2015.

## III.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  Scott v. Harris, 550 U.S. 372, 378 (2007) (alteration in original) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

---

[1] Plaintiff appears to have mislabeled Count VIII as a second Count VII in the Complaint.

IV.     **Analysis**

A.      Count I:  Retaliatory Hostile Work Environment

Count I presents a claim of retaliatory hostile work environment:  Román alleges that she
was subjected to an abusive working environment in retaliation for having engaged in protected
activity by complaining of discrimination.  This claim differs from the more typical claim of
*discriminatory* hostile work environment, for which a plaintiff alleges that she has been
subjected to an abusive working environment based on her membership in a protected class.  The
D.C. Circuit has recognized the validity of retaliatory-hostile-work-environment claims.  See
Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  In Baird, the court described the claim
as requiring a plaintiff to show that her employer "subjected her to 'discriminatory intimidation,
ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment.'"  Id. at 1250 (quoting Baloch v.
Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  The Circuit's use of the term
"discriminatory intimidation" has been a source of some confusion for district courts applying
this standard.  Most have interpreted it as requiring a demonstration of *retaliatory*, rather than
discriminatory, intimidation—that is, intimidation based on the employee's participation in
protected activity rather than her membership in a protected class.  See, e.g., Miles v. Kerry, 961
F. Supp. 2d 272, 294 (D.D.C. 2013); Bergbauer v. Mabus, 934 F. Supp. 2d 55, 79 (D.D.C. 2013);
see also Harrison v. Office of Architect of Capitol, 985 F. Supp. 2d 13, 21–22 (D.D.C. 2013)
(allowing a plaintiff to demonstrate discriminatory or retaliatory intimidation to support a claim
of retaliatory hostile work environment).  Román urges the Court to apply that standard, and the
government agreed at oral argument that it is the appropriate one.  Accordingly, Román must
show that she was subjected to retaliatory intimidation that was "sufficiently severe or pervasive

to alter the conditions of [her] employment and create an abusive working environment." <u>Baird</u>, 662 F.3d at 1250 (quoting <u>Baloch</u>, 550 F.3d at 1201).[2]  And in order to demonstrate that the work environment was abusive for purposes of this standard, Román must show that the acts giving rise to the claim are "adequately connected to each other . . . [as] 'part of the same unlawful employment practice' . . . as opposed to being an array of unrelated . . . retaliatory acts." <u>Baird</u>, 662 F.3d at 1252 (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 (2002)).

Román complained of discrimination by her supervisors during the April 17, 2007 meeting with HUD's General Counsel, through her request for EEO counseling in August 2007, and in her formal EEO complaint in November 2007.  She alleges that HUD responded to these complaints by "intentionally subject[ing] [her] to a retaliatory hostile and abusive work environment" in the following ways: (1) denying her the promotion to Managing Attorney; (2) reassigning her cases to junior, male attorneys; (3) initiating three separate investigations against her; (4) downgrading her performance to "Fully Successful" for 2007; (5) placing her

---

[2] With respect to how severe retaliatory intimidation must be for a plaintiff to prevail, Román urges that the proper standard is a less stringent one imported from *non*–hostile work environment retaliation cases.  She contends that she need show only that the retaliatory intimidation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Pl.'s Opp'n 32 (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).  But <u>Burlington Northern</u> did not concern hostile work environment claims.  <u>See Burlington N.</u>, 548 U.S. at 59 (identifying the plaintiff's retaliation claims).  And the D.C. Circuit in <u>Baird</u> required a demonstration meeting the standard articulated above—that the intimidation have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Baird</u>, 662 F.3d at 1250.  Courts in this district have applied that standard.  <u>See, e.g.</u>, <u>Bergbauer</u>, 934 F. Supp. 2d at 82–83 (applying the more stringent standard articulated in <u>Baird</u> despite the court's instinct that the standard for retaliatory hostile work environment should be more lax than that for discriminatory hostile work environment).  In any event, because the Court concludes that Román has put forth sufficient evidence to substantiate her claim under the more stringent standard, the Court need not linger over the potential merits of a more lax standard.

under a PIP in 2008 and interfering with her performance during it; (6) denying her request to

take four hours of leave in February 2008; (7) proposing to suspend her without pay later that

same month; (8) placing her under an OIP in May 2008; (9) failing to take remedial action when

she reported sexual harassment by Gleaton; (10) involuntarily reassigning her to an office in

Birmingham, Alabama in June 2008; (11) suspending her for two days without pay in August

2008; (12) rating her performance as unsatisfactory in 2008; (13) proposing to remove her in

October 2008; and (14) reassigning her to an office outside of HUD headquarters in 2009.  See

Compl. ¶ 73.  Taken together, Román argues, these incidents reflect a "relentless campaign to

destroy [her] career," spanning "a period of nearly two years . . . immediately following the April

17, 2007 meeting in which she engaged in protected activity."  Pl.'s Opp'n 33–34.

Applying the standard discussed above, there is no dispute that Román's complaints of

discrimination constituted protected activity.  The Court thus must determine whether Román

has presented evidence that her supervisors' conduct was "sufficiently severe or pervasive to

alter the conditions of [her] employment and create an abusive work environment," Baird, 662

F.3d at 1250, and whether the evidence supports a reasonable inference that her supervisors took

the alleged actions against her *because* she complained of discrimination.

### 1.    Severity, Pervasiveness, and Abusiveness

HUD contends that the incidents cited by Román are not sufficiently severe to create an

abusive work environment because "nearly all of the incidents . . . involve management issues

that were non-hostile in nature, and the limited allegations involving Plaintiff's sex are similarly

non-hostile in nature as they were not physically threatening and were isolated events."  Def.'s

Mot. Summ. J. 8.  In making this argument, HUD focuses on Román's allegations that

Christopher asked her perform tasks traditionally assigned to women, such as decorating the

office and throwing office parties, as well as the downgrade of her performance rating.  Id. at 9–
10.  Yet Román does not directly cite those allegations as support for this claim in her
Complaint.  HUD glosses over the central evidence supporting Román's claim that her
supervisor's actions were severe and abusive: that concerning the repeated investigations
instituted against her.

To recap, Christopher referred Román to HUD's Office of Protective Services after a nail
was found in a cupcake served at an office holiday party.  Although Román was on leave at the
time and did not attend the party, Christopher suspected her to be the culprit because she viewed
Román as a "disgruntled" employee.  The subsequent investigation failed to link Román to the
incident.  Later, Christopher and her assistant launched their own investigation of Román to test
their suspicions that she had improperly accessed Christopher's computer.  They collaborated on
a fake email ordering Román's transfer to Birmingham, Alabama and saved it to Christopher's
computer.  After learning that Román had become aware of the email, Christopher referred her to
the HUD OIG for computer hacking.  Román maintains that she came across a hard copy of the
email on a networked printer, and the OIG failed to find any wrongdoing.  Finally, Christopher
again referred Román to the OIG for unauthorized computer access after Román discovered a
copy of her Proposal to Remove prior to its release.  Once again, Román explains that she found
the document on a shared printer, and the OIG found no violation of policy.

Román characterizes these investigations as baseless and abusive.  She adds that
Christopher's conduct was sufficiently severe to alter the conditions of her employment because,
among other reasons, the investigations impugned her integrity, which is crucial to her
functioning as an attorney.  Cf. Zauderer v. Office of Disciplinary Counsel of the Supreme Court
of Ohio, 471 U.S. 626, 669 (1985) (Brennan, J., concurring in part, concurring in the judgment in

part, and dissenting in part) ("This Court's casual indifference to the gravity of this injury inflicted on an attorney's good name demeans the entire legal profession."). HUD's position is not entirely clear. It appears to contend that while none of the investigations implicated Román, Christopher's actions were nonetheless warranted in light of her reasonable suspicions that Román had engaged in misconduct.

Viewing the evidence in the light most favorable to Román, the Court concludes that she has cleared the bar for establishing an abusive work environment at the summary judgment stage of the proceedings. Legitimately investigating an employee for suspected misconduct is generally not grounds for a hostile work environment claim. See Sledge v. District of Columbia, 63 F. Supp. 3d 1, 26 (D.D.C. 2014). Here, however, the alleged repetitive nature of the referrals, the consistent lack of negative findings, the amateurism surrounding Christopher's efforts to ensnare Román in misconduct, and the effect that allegations of professional and criminal misconduct would have on a practicing attorney all could lead a reasonable jury to conclude that the investigation referrals were baseless and created an abusive work environment that altered the conditions of Román's employment.

## 2.   Causation

Román has also proffered sufficient evidence to support an inference that her supervisors subjected her to an abusive work environment *because* she had complained of discriminatory treatment. In the absence of direct evidence of retaliatory intent, a causal relationship between protected activity and adverse actions by an employer may be inferred through either temporal proximity or the existence of a pattern of antagonism. See Taylor v. Solis, 571 F.3d 1313, 1322–23 (D.C. Cir. 2009). Román seeks to draw both inferences. In order to establish temporal proximity, the connection must be "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S.

268, 273 (2001) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001))

(citing with approval cases finding spans of three and four months too distant, see Richmond v.

ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997); Hughes v. Derwinski, 967 F.2d 1168, 1174–

75 (7th Cir. 1992)).  While certain of the actions that Román claims were retaliatory occurred

relatively soon after her protected activity—the cupcake investigation, for instance, commenced

about six weeks after her formal EEO complaint—others were much more distant.  Román's

evidence fits more closely into a pattern-of-antagonism theory of causation.  The Protective

Services investigations, OIG referrals, and planting of the Birmingham-transfer email occurred

against a backdrop of a cycle of protected activity and repeated adverse personnel actions that

have been recognized in this district as sufficient to establish a pattern of antagonism.  See Payne

v. District of Columbia, 4 F. Supp. 3d 80, 90 (D.D.C. 2013) (concluding that "repeated,

escalating acts of retaliation," such as "internal complaints"; "threats that [the employee] would

be terminated"; and "formal action to change [the employee's] status, reduce [her] duties, and

ultimately terminate [her]" can constitute a pattern of antagonism supporting an inference of

causation).  Román has thus drawn a cognizable inference of retaliatory causation.

### 3.   Connectedness

HUD also argues that the incidents cited by Román do not meet the requirement that an

employer's retaliatory actions be "adequately connected to each other," Baird, 662 F.3d at 1252,

so as to be "part of the same unlawful employment practice," id. (quoting Morgan, 536 U.S. at

122) (internal quotation mark omitted).  In other words, the alleged retaliation must "involve[]

the same type of employment actions, occur[] relatively frequently, and [be] perpetrated by the

same managers."  Id. at 1251 (first and second alterations in original) (quoting Morgan, 536 U.S.

at 120–21) (internal quotation marks omitted).  Yet Román has proffered evidence that the

incidents at issue were connected by retaliatory animus stemming from her complaints, that they were similar in kind, that they occurred with relative regularity, and that they were perpetrated by the same two antagonists: Christopher and Alexander.  Román has thus proffered evidence of sufficient connectedness to meet this requirement.  Accordingly, the Court will deny the Defendant's summary judgment motion as to this claim.

B.    Count II:  Discriminatory Hostile Work Environment

The standard for discriminatory hostile work environment requires that "a plaintiff . . . show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21).  A plaintiff must also demonstrate that "there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."  Na'im v. Clinton, 626 F. Supp. 26 63, 73 (D.D.C. 2009).  Courts look to the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Id. (citing Faragher, 524 U.S. at 787–88).

Román contends that all of the same evidence cited in support of her retaliatory hostile work environment claim also supports this claim.  The only evidence she offers to support a link between the allegedly hostile behavior and her membership in a protected class, however, is that Christopher directed her to decorate the office and organize parties—tasks which, Román attested in her declaration, Christopher never required of male employees.  See Pl.'s Opp'n Ex. 45 ¶ 12.  HUD again counters that Román has not established the required link between the alleged acts and her membership in a protected class, see Def.'s Mot. Summ. J. 10, and reiterates its argument that the alleged acts are too discrete to support a hostile work environment claim.

Even if Christopher never required male employees to decorate the office or organize parties, Román has failed to establish that these requests were "sufficiently extreme to constitute an alteration in the conditions of employment," a showing required "so that Title VII does not evolve into a 'general civility code.'" Hunter, 710 F. Supp. 2d at 158 (quoting Faragher, 524 U.S. at 788). A "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Id. (ellipsis in original) (quoting Harris, 510 U.S. at 21). And requests to decorate or prepare for a party do not rise to the level of offensive, gender-based epithets. They are more aptly characterized as typical "tribulations of the workplace," which are not actionable under Title VII. Keys v. Donovan, 37 F. Supp. 3d 368, 373 (D.D.C. 2014) (quoting Faragher, 524 U.S. at 788) (internal quotation mark omitted).

Román also alleges that a male attorney, Allen Villafuerte, was selected for the Managing Attorney position over her, and that her work was reassigned to male attorneys. See Pl.'s Opp'n 42. These allegations fail to support a discriminatory-hostile-work-environment claim for two reasons. First, Román primarily contends that these actions were taken in retaliation for her complaint about Christopher rather than due to her gender. Her only attempt to link them to her gender is a conclusory assertion that they were "discriminatory." See id. 43. "[H]ostile behavior, no matter how unjustified or egregious, cannot support a claim of [discriminatory] hostile work environment" where there is no evidence of "linkage between the hostile behavior and the plaintiff's membership in a protected class." Na'im, 626 F. Supp. 2d at 73 (citing, e.g., Baloch, 550 F.3d at 1201; Nurriddin, 382 F. Supp. 2d at 108). So it is here. This evidence fails to support Román's claim because she has not shown that she was denied the promotion or had work reassigned because of her gender.

Second, without more, ordinary work-related activities, such as hiring decisions and work reassignment, typically cannot form the basis of a hostile work environment claim.  See Nurriddin, 674 F. Supp. 2d at 94 ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").  Accordingly, the Court will grant Defendant's motion for summary judgment as to this claim.

C.      Counts III and VI:  Retaliation – Suspension and Nonselection

Counts III and VI present retaliation claims based on Román's suspension and nonselection for the Managing Attorney position.  "To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action."  Nai'm, 626 F. Supp. 2d at 76 (footnote omitted) (citing Burlington N., 548 U.S. at 67–69).  To demonstrate a causal connection, a plaintiff must show "but for" causation—"that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

Following the familiar McDonnell Douglas framework, "[i]f the employer successfully presents a legitimate, non-retaliatory reason for its actions, 'the presumption raised by the prima facie [case] is rebutted and drops from the case.'"  Nai'm, 626 F. Supp. 2d at 76 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).  At that point, courts at the summary judgment stage "need resolve only one question:  'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee'" on

an impermissible ground? Id. (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)).

As noted above, Román clearly engaged in protected activity when she complained about Christopher's employment practices in the April 17, 2007 meeting, when she sought EEO counseling on August 9, 2007, and when she filed her formal EEO complaint on November 19, 2007. The Court therefore must determine whether the employment actions upon which Román bases these counts—the Proposal to Suspend, the actual suspension, and her nonselection for the Managing Attorney position—were "materially adverse" and, if they were, whether the evidence supports a finding that they were causally linked to her protected activity. The Court will treat each action separately.

### 1. Proposal to Suspend and Suspension

The Proposal to Suspend is not a "materially adverse" employment action. The Supreme Court has recognized that suspensions without pay—even where employees are later compensated with backpay—may be actionable as retaliatory. See Burlington N., 548 U.S. at 72. And the D.C. Circuit has held that a "temporary deprivation of wages counts as a materially adverse action." Taylor, 571 F.3d at 1321. "[C]ourts have been unwilling to find adverse actions," however, "where the suspension is not actually served," and "had no actual effects." Baloch, 550 F.3d at 1199 (citing Whittaker v. N. Ill. Univ., 424 F.3d 640, 647 (7th Cir. 2005) (finding proposal to suspend not to be materially adverse); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 588 n.15 (11th Cir. 2000)). Here, even though the proposed suspension did occur, Román has not shown that the Proposal to Suspend had effects independent of the suspension itself. Her claim that the proposal was retaliatory therefore cannot survive summary judgment.

As for the actual suspension, although it could qualify as a materially adverse action under D.C. Circuit precedent, Román has not established causation—that she was suspended because she engaged in protected activity.  An employer cannot retaliate against an employee unless he or she has "knowledge of [the employee's] protected activity."  Jones v. Bernanke, 557 F.3d 670, 679 (D.C. Cir. 2009).  While the plaintiff need not present direct evidence of the employer's knowledge at the summary judgment stage, she must at least put forward "circumstantial evidence that could reasonably support an inference" of such knowledge.  Id.  As she did with respect to her retaliatory-hostile-work-environment claim, Román attempts to draw that inference through both temporal proximity and a pattern of antagonism.  See Taylor, 571 F.3d at 1322–23.  She presents some evidence of temporal proximity—chiefly, that Alexander began to build a case against her by compiling the MFR only three days after the April 2007 meeting—and the various actions taken by Christopher and Alexander throughout the period covered by her protected activities could reflect a pattern of antagonism.  But Alexander and Christopher were not the deciding officials on the suspension; Herold was.

Román attempts to circumvent this inconvenient fact by invoking the "cat's paw" theory of causation, under which a neutral decisionmaker does not break the chain of causation where the alleged retaliator "play[s] a role in informing the [decisionmaker] about [the plaintiff] and her conduct" such that the decisionmaker "becomes 'the conduit of [the retaliator's] prejudice—his cat's paw.'"  Walker v. Johnson, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (quoting Griffin v. Wash. Convention Ctr., 142 F.3d 1308, 1311–12 (D.C. Cir. 1998)).  Yet Román concedes that Herold based his decision "solely" on the Proposal to Suspend, a reply by Román, and various limited supporting materials, including emails between Alexander and Román.  See Pl.'s Opp'n 21–22; id. Ex. 13, at 1.  She also acknowledges that in his deposition, Herold did not recall ever

speaking with Alexander or anyone outside of the human resources department about the proposal, Pl.'s Opp'n 22; see also id. Ex. 42, at 25–26, and that he made the decision "[w]ithout *any* knowledge" of concerns about the proposal that had been raised by a previously designated deciding official, who had recused herself, and others in the human resources department.  In other words, Román does not even allege, much less present evidence, that Herold's decision was influenced by his knowledge of her protected activity or by any retaliatory motive on the part of Alexander or Christopher.  See Pl.'s Opp'n 21–22.  Román has therefore failed to draw an inference that Herold's decision was tainted by retaliatory intent.

    Nor has Román presented evidence that retaliatory animus on the part of Alexander was the proximate cause of her suspension, which is an alternative way of establishing "cat's paw" causation in employment cases.  In Staub v. Proctor Hospital, the Supreme Court explained that "it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's [retaliatory] animus) from being the proximate cause of the harm."  562 U.S. 411, 419 (2011).  It rejected the view that an employer can "effectively shield[]" itself from liability for "discriminatory acts and recommendations of supervisors that were *designed and intended* to produce the adverse action" merely by "isolat[ing] a personnel official from an employee's supervisors."  Id. at 420.  Such liability survives because "the supervisor's biased [recommendation] . . . remain[s] a causal factor" where "the independent investigation takes it into account *without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.*"  Id. at 421 (emphasis added).  The Court concluded that a supervisor's bias proximately caused an adverse employment action where the neutral decisionmaker "relied on" the supervisor's account of wrongdoing by the employee, and, without following up on the employee's version of the events,

adhered to her decision.  Id. at 415; see also Walker, 798 F.3d at 1095–96 (applying Staub in the context of a Title VII claim).

That is not what happened here.  Herold based his decision not only on the proposal authored by Alexander, but also on a reply by Román and emails exchanged between Román and Alexander.  See Pl.'s Opp'n Ex. 13, at 1.  Unlike the deciding official in Staub, he did not fail to consider one side's version of the events and rely solely on the other's.  To the contrary, he downgraded the proposed suspension period from five days to two after hearing Román's side of the story.  See id. at 3.  Accordingly, because Román has not presented evidence sufficient to support her retaliation claim as to the suspension under any recognized theory of causation, the Court will grant summary judgment to HUD as to this claim.

### 2.  Nonselection

Román's claim as to retaliatory nonselection, by contrast, is sufficiently substantiated to survive summary judgment.  HUD contends that Christopher and Alexander chose Villafuerte for the promotion to Managing Attorney because he was more experienced and had outperformed Román as the Acting Managing Attorney.  Román counters that her qualifications were comparable to Villafuerte's and that Christopher's and Alexander's failure to retain notes and other documentation of the interview process casts doubt on their proffered explanation.

"[A] refusal to promote is a materially adverse action" because it denies a plaintiff "a tangible opportunity to advance her career."  Taylor, 571 F.3d at 1321 (citing Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003)).  With respect to causation, Christopher and Alexander made the decision not to select Román for the Managing Attorney position on May 30, 2007, just six weeks after Román's initial protected activity during the April 17, 2007 meeting.  In addition, Alexander began compiling the MFR on Román prior to the selection

decision and just three days after the April meeting.  A reasonable jury could infer from this temporal proximity and budding pattern of antagonism—which as discussed above, blossomed over the succeeding months and years—that Román was not selected because of her complaints about Christopher.

That inference is not much weakened by HUD's rebuttal.  HUD points to Villafuerte's five-years'-longer service in the Office of Litigation and the decisionmakers' opportunity to observe both candidates in the role of Acting Managing Attorney.  See Def.'s Reply 9–10.  It also cites Christopher's and Alexander's opinion that Román "made a grievous error . . . while preparing the Office of Litigation's annual audit" as Acting Managing Attorney.  Id. at 10.  In order to defeat summary judgment as to this claim, Román need not, as Defendant contends, see Def.'s Reply 10–11, demonstrate that she was significantly more qualified than Villafuerte, see Kilby-Robb v. Duncan, 77 F. Supp. 3d 164, 176 (D.D.C. 2015); see also Youssef, 62 F. Supp. 3d at 99–100 (permitting the plaintiff's retaliation claim based on nonselection to go forward even though he had not demonstrated that he was significantly more qualified than the selectee).  And the "relative difference" between her qualifications and Villafuerte's "does not so greatly favor" Villafuerte "that no reasonable jury could conclude [that Román] would have been promoted but for the alleged retaliatory animus" of Christopher and Alexander.  Kilby-Robb, 77 F. Supp. 3d at 176.

In addition to demonstrating temporal proximity and a pattern of antagonism, Román also contends that Christopher and Alexander's failure to retain notes from the interview process supports an inference of retaliation.  While an "absence of documentation" of an interview "could lead a reasonable jury to doubt" a defendant's proffered explanation for a hiring decision, Hamilton v. Geithner, 666 F.3d 1344, 1356 (D.C. Cir. 2012), and while Román points to two

labor regulations requiring the creation and preservation of records from promotion decisions, see 5 C.F.R. § 335.103; 29 C.F.R. § 1602.14, neither party contends that Christopher or Alexander based their decision on the interviews.  And, as discussed further below, where courts have found an absence of interview-related documentation to support an inference of discrimination or retaliation, employers have based their hiring decisions, at least in part, on interview performance.  See Hamilton, 666 F.3d at 1351; Browne v. Donovan, 12 F. Supp. 3d 145, 153 (D.D.C. 2014).  Even putting aside the absence of documentation of the interview process, a reasonable jury could conclude that the nonselection was retaliatory from the evidence supporting temporal proximity between Román's protected activity and the nonselection decision, a potential pattern of antagonism of which the MFR and the nonselection decision were parts, and the two applicants' relative qualifications.  The Court will therefore deny HUD's summary judgment motion as to this claim.

D.    Counts IV, V, VII, and VIII:  Discriminatory Suspension and Nonselection

Finally, in Counts IV, V, VII, and VIII, Román alleges that her suspension and nonselection for the Managing Attorney position resulted from discrimination based on her gender.  The "two essential elements of a discrimination claim" under Title VII "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability."  Baloch, 550 F.3d at 1196 (citing 42 U.S.C. § 2000e-16(a)).  Unpaid suspensions and denials of promotions qualify as adverse actions for the purposes of a Title VII discrimination claim.  See id.

With respect to causation, although the Complaint separates Román's discrimination claims based on "pretext" and "mixed motive" causation, Román abandons that distinction in the briefing.  See Pl.'s Opp'n 31 n.14.  The D.C. Circuit has explained that, "[e]ven though we have

26

described but-for and mixed-motive cases as 'alternative ways of establishing liability,' a plaintiff may proceed under both theories simultaneously." Ponce v. Billington, 679 F.3d 840, 845 (D.C. Cir. 2012) (citation omitted) (quoting Fogg v. Gonzales, 492 F.3d 447, 453 (D.C. Cir. 2007)).  And the Supreme Court in Nassar clarified that "[a]n employee who alleges status-based discrimination under Title VII," 133 S. Ct. at 2522, unlike one who alleges retaliation, see id. at 2325, "need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act[;] [s]o-called but-for causation is not the test," id. at 2522–23.  Instead, a plaintiff need show only that "the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Id. at 2523.  The Court will apply that standard to Román's suspension and nonselection for the Managing Attorney position.

### 1. Suspension

Román offers two facts to demonstrate that she was suspended because she is a woman: first, that HUD never proposed to suspend any male attorneys during the relevant time period, which the agency admitted in discovery, see Pl.'s Opp'n 43 (citing id. Ex. 15); and second, that Alexander proceeded with the suspension despite concerns by HR Specialist Hogan that a letter of reprimand would be more appropriate considering Román's years of service and previously unblighted record.  In the Court's view, neither fact supports an inference that Román's suspension was motivated by her gender.

That no male attorney was suspended during the relevant time period proves little. Plaintiffs in employment discrimination cases can support an inference of discriminatory intent by showing that they were disciplined more severely than similarly situated employees in non-protected classes.  See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015).

"To prove that she is similarly situated to a male employee, a female plaintiff must . . .

demonstrate that 'all of the relevant aspects of her employment situation were nearly identical to

those of the male employee," Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting

Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995))—for

example, that she and "the allegedly similarly situated . . . employee were charged with offenses

of comparable seriousness." Burley, 801 F.3d at 301 (alteration in original).  Accordingly, to

support a discriminatory inference here, Román would need to show that male attorneys who

were found to have demonstrated a lack of candor or similar lapses were not disciplined at all or

were disciplined less harshly than she was.  Because she has offered no evidence to support such

a showing, Román cannot benefit from the absence of male-attorney suspensions in general.

The recommendation of HR Specialist Hogan that Román be reprimanded rather than

suspended also does not support an inference of discriminatory intent.  While it might suggest

pretext—by undercutting Alexander's finding that Román's conduct warranted a suspension—

pretext alone, without evidence of discriminatory intent, is insufficient to sustain a discrimination

claim.  See Giles v. Transit Emps. Fed. Credit Union, 794 F.3d 1, 9 (D.C. Cir. 2015)

(emphasizing the difference between evidence from which a reasonable jury could disbelieve an

employer's proffered reasons and evidence supporting the plaintiff's argument that the adverse

action was taken for an impermissible reason); Brady, 520 F.3d at 494 (requiring a plaintiff

asserting discrimination to "produce[] sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason *and* that the employer

intentionally discriminated against the employee on the basis of race, color, religion, sex, or

national origin" (emphasis added)).  The reasons for Hogan's recommendation—Román's long

tenure and previous record—are gender-neutral and, as noted above, Román has presented no

evidence that male HUD attorneys were treated differently for similar infractions.  Absent such

evidence, the recommendation reflects, at most, a difference of opinion regarding the seriousness

of Román's conduct as viewed against her overall employment history.  The Court will therefore

grant summary judgment in favor of HUD on this claim.

2.   <u>Nonselection</u>

Finally, Román asserts that Villafuerte was selected for the Managing Attorney position

over her because of her sex.  Her reasoning, similar to that in support of her retaliation claim, is

that she was equally qualified, that Christopher and Alexander appear not to have retained notes

from the interview process or their written recommendation that Villafuerte be hired, and that

their composite scoresheet awarding Villafuerte one more point than Román does not show how

each of them rated the candidates separately.  <u>See</u> <u>id.</u> at 44.  HUD counters that its selection of

Villafuerte was based on legitimate, nondiscriminatory reasons: his greater experience and

superior performance relative to Román's as Acting Managing Attorney.

With respect to their qualifications, Román maintains that "Villafuerte's few years of

experience over Ms. Román[] counts for nothing, especially given the fact that both attorneys

had been practicing for over two decades at the time of the selection."  Pl.'s Opp'n 45.  In the

discrimination context, however, unlike in the retaliation context, "a disparity in qualifications,

standing alone, can support an inference of discrimination only when the qualifications gap is

'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is

'markedly more qualified,' or 'substantially more qualified,' or 'significantly better qualified'

than the successful candidate."  <u>Hamilton</u>, 666 F.3d at 1352 (quoting <u>Holcomb v. Powell</u>, 433

F.3d 889, 897 (D.C. Cir. 2006)).  Román does not contend that she was more qualified than

Villafuerte, let alone "significantly" more qualified.

29

Román also asserts that the absence of notes from the interview process constitutes a procedural irregularity supporting an inference of discrimination.  Courts in this circuit have held that the failure to retain, or the destruction of, notes from interviews can, under certain circumstances, support an inference of discrimination.  See Hamilton, 666 F.3d at 1355–56; Browne, 12 F. Supp. 3d at 153.  But in those cases, the interviews themselves were at issue.  In Hamilton, the employer's proffered explanation for the hiring decision was that the plaintiff "did not perform well in his interview . . . as compared to [the selectee's] performance."  666 F.3d at 1351 (ellipsis in original) (quoting Hamilton v. Paulson, 542 F. Supp. 2d 37, 43 (D.D.C. 2008)).  And the lack of "documentation of [that explanation] . . . weaken[ed] their claim that they selected [the selectee] because [the plaintiff's] interview did not go well."  Id. at 1355–56.  Similarly, in Browne, the deciding officials "both stated that they were extremely impressed by [selectee] in his interview, and that he was the clear frontrunner for the position coming out of the interview process."  12 F. Supp. 2d at 153.  "However, the interview notes" that could have verified that that "was their contemporaneous evaluation of [the selectee] relative to Plaintiff ha[d] been lost."  Id. (citing Hamilton, 666 F.3d at 1357).  The court concluded that "the absence of important contemporaneous documentation" supported the denial of the employer's motion for summary judgment.  Id.

Here, by contrast, neither party puts the interviews at issue.  HUD's proffered explanation of Christopher and Alexander's decision to promote Villafuerte over Román is not that Villafuerte performed better in the interview, but that he was better qualified.  And Román has not proffered evidence supporting the contrary conclusion or that HUD's explanation is pretext for discrimination.  While she maintains that the interview "scoring process was . . . subjective and does not give any insight into the panelist's impressions of the applicant's performance,"

Pl.'s Opp'n 12, she expressly rejects the view that "the interview scores were the determining factor in the selection," id. at 13.  Nor does she argue that she was so much better qualified than Villafuerte that the deciding officials' decisionmaking process during the interviews must have been shaped by discriminatory intent.  Therefore, the Court will also grant HUD's summary judgment motion as to this claim.

###### V.      Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part.  An order accompanies this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   March 1, 2016